UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

MASON SWAIN,

                      Plaintiff,

  - against-

LANXESS CORPORATION and LION
COPOLYMER GEISMAR LLC,

                      Defendants.

---------------------------------------------------------------X

No. 1:24-cv-6869

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Mason Swain ("**Plaintiff**" or "**Mason**"), by and through his undersigned attorneys, files this Complaint against LANXESS Corporation ("**LANXESS**") and Lion Copolymer Geismar LLC ("**Lion Copolymer**" and, collectively with LANXESS, "**Defendants**"), and alleges as follows:

## NATURE OF THIS ACTION AND PRELIMINARY STATEMENT

1. This is an action for declaratory judgment that a discharge injunction embodied in the confirmed Chapter 11 plan of Defendants' predecessor (the "**Chemtura Plan**")[1] does ***not*** enjoin the prosecution of Plaintiff's pending state court personal injury action (the "**PI Action**").[2]

2. As set forth more fully below, Mason's father was employed at a Louisiana

---

[1] Joint Chapter 11 Plan of Chemtura Corporation, et al., *In re Chemtura Corp.*, No. 09-11233-jlg, Dkt. No. 4387, Oct. 29, 2010.

[2] The PI Action, No. C-730179, is styled *Mason Swain vs. Turner Industry Group, L.L.C., et al.*, and is pending before a Louisiana state court, the 19th District Court for the Parish of East Baton Rouge.

petrochemical plant (the "**Geismar Plant**") owned and operated by Defendants' predecessor, where Mason's father was exposed to harmful chemicals over the 17 years he worked there. Mason was born in 1998, near the midpoint of his father's tenure at the Geismar Plant. Due to his father's continuous exposure to these harmful chemicals during the timeframe leading up to Mason's conception and periconception,[3] Mason was born prematurely with profound personal injuries. These injuries are expected to debilitate Mason for the rest of his life and necessitate lifelong medical care.

3.      As will be previewed below, this case is distinguishable from prior cases where other would-be plaintiffs have sought to sue a successor to debtors (*i.e.*, "**Chemtura, et al**.") for pre-Chemtura Plan confirmation conduct and were thwarted by court decisions in those cases. Plaintiff anticipates that Defendants' will rely on those prior court decisions, but these prior cases involve materially different facts rendering them inapplicable to Mason's PI Action.

4.      Defendants will undoubtedly argue that Plaintiff was afforded constructive notice of the October 30, 2009 bar date ("**Bar Date**") and that the PI Action is barred and violative of the discharge injunction in the Chemtura Plan ("**Plan Injunction**").[4] But Plaintiff was a known creditor of debtors at the time of the bankruptcy, as further set out below, and so was entitled to actual notice of the Bar Date, which he indisputably did not receive.  Thus, he is not barred by the Plan Injunction from proceeding with his PI Action.  Defendants will play down Plaintiff's infancy at the time of the Bar Date, which occurred less than a week after Mason's eleventh birthday and

---

[3]     "Periconceptual" means "of, relating to, or done during the period before conception to early pregnancy."  *Merriam-Webster.com Medical Dictionary*, https://www.merriam-webster.com/medical/periconceptional.  Last viewed Sep. 9, 2024.

[4]     Indeed, LANXNESS' counsel has argued this in a letter addressed to Plaintiff's personal injury counsel dated Jan. 26, 2024, asserting that Mason's claim is barred by the Plan Injunction. Hence, this dispute is presented to this Court in this declaratory relief action.

2

brush aside Plaintiff's lack of any ability to know at that time, a lack shared by his parents, that he had any claim at all.

5. The causal link underlying Plaintiff's injuries lies at the root of that lack of awareness of his claim, setting Mason's case apart from earlier benzene claimants in a prior *Chemtura* opinion.[5] Mason's father—not Mason himself—was directly exposed to toxic chemicals at the Geismar Plant. But Mason's father did not bring those chemicals home to Mason in any conventional sense. Mason's "exposure" is not analogous to a secondary-exposure asbestos case, the classic example being where a father exposes his family by wearing toxic dust-covered work clothing home. Here, Mason's father was exposed at work prior to Mason's conception and sustained damage to his internal reproductive system during the time frame leading up to Mason's biological conception and during his gestation, resulting in Mason's injury sustained *in utero*. Thus, it cannot be maintained that a plant worker, at the time of the 2009 Bar Date, ought to have connected his 11-year-old child's grievous congenital injuries to the plant worker's own on-the-job chemical exposures *prior* to the child's conception and during his gestation, injuries that resulted from damage to the father's internal reproductive mechanisms. Yet that notion is at the root of what Defendants are expected to argue in defense of this case.

6. Even if proper constructive notice would suffice here—it does not because Mason was a known creditor in 2009—Defendants will surely attempt to whitewash a significant due process defect in the notice of Bar Date upon which constitutionally sufficient constructive notice must be grounded. The notice of Bar Date in the *Chemtura* case was published in five newspapers in the State of Louisiana, but in cities far distant from the Geismar Plant. Inexcusably, the daily

---

[5] *In re Chemtura Corp.*, Case No. 09-11233 (JLG), 2016 WL 11651714 (Bankr. S.D.N.Y. Nov. 23, 2016).

newspaper circulated in Baton Rouge was ***not*** one of the five. Although just 21 miles from Baton Rouge, the community of Geismar is 67 miles from New Orleans, yet no notice for Geismar Plant employees was published in a paper that they might actually see, like the paper in nearby Baton Rouge.

7. However, it is the separate notice addressed to the residents of distant Geismar that Chemtura, *et al*., concurrently published with the Bar Date notice in the New Orleans paper that lays bare the inadequacy of the notice regime. Having determined that a site-specific notice to the community of Geismar was warranted, Chemtura, *et al.,* published that notice in a remote newspaper where people residing in and around Geismar were not likely to see it. Further, it did so despite Geismar being within the circulation area of Baton Rouge's daily paper.

8. Therefore, notice of the Bar Date to Mason Swain was constitutionally defective and as a result of such defective notice, Mason's PI Claim cannot be barred by the Plan Injunction.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1334(b), as this matter involves, *inter alia*, a discharge injunction embodied in a confirmed plan pursuant to Chapter 11 of the Title 11 of the United States Code. Plaintiffs seek a declaratory judgment under the Declaratory Judgment Act pursuant to 28 U.S.C. § 2201.

10. Venue in this district is proper as to Defendants pursuant to 28 U.S.C. § 1391(b)(2) in that the Confirmation Order giving rise to this Complaint and embodying the Plan Injunction was issued by the United States Bankruptcy Court for the Southern District of New York.

## THE PARTIES

11. Plaintiff Mason Swain is an adult citizen of the State of Louisiana who resides at

443 Brenda Drive, Denham Springs, Louisiana 70726.

12. Defendant LANXESS Corporation, individually and as successor-by-merger to Uniroyal Chemical Company, Inc., is a Delaware corporation with its principal place of business in the Commonwealth of Pennsylvania located at 111 RIDC Park West Drive, Pittsburgh, Pennsylvania 15275-1112, and may be served with summons by serving its registered agent in the State of New York, CORPORATION SERVICE COMPANY at the following address: 80 STATE STREET, ALBANY, NEW YORK 12207-2543.

13. Defendant Lion Copolymer Geismar LLC, individually and as successor-by-merger to Uniroyal Chemical Company, Inc., is a Delaware limited liability company that, upon information and belief, does not maintain a registered agent in the State of New York. It may therefore be served through its registered agent in the State of Delaware, THE CORPORATION TRUST COMPANY, at the following address: CORPORATION TRUST CENTER, 1209 ORANGE ST., WILMINGTON, DELAWARE 19801.

## FACTUAL SUMMARY

**The PI Action and Plaintiff's Underlying Injuries**

14. Plaintiff recently commenced the PI Action, seeking recovery of damages for profound personal injuries he has suffered since before his birth in October 1998. Plaintiff alleges in the PI Action that his injuries were caused by petrochemical vapors to which his father was exposed while employed by Uniroyal Chemical Company, Inc. ("**Uniroyal**") at the Geismar Plant in the time leading up to Mason's conception in early 1998. LANXESS and Lion Copolymer, Defendants here and in the PI Action, are successors-by-merger to Uniroyal which, at the operative

time, owned and operated the Geismar Plant.[6]

15. Plaintiff's father Mark Swain ("**Mark**") was employed at the Geismar Plant from approximately 1990 through 2007, a period during which the primary product manufactured there was ethylene propylene diene monomer rubber ("**EPDM Rubber**"), a type of synthetic rubber made from petrochemicals that include ethylene, propylene, and diene monomers (hence, "EPDM"). Mark worked in "Operations" in the EPDM Rubber finishing and packaging areas of the Geismar Plant as well as in the "Recovery Section." Thus, leading up to Mason's conception, Mark was frequently exposed to petrochemical vapors emanating from various equipment at the Geismar Plant (for example, solvent slurry, mechanical dryers, and extruders), and as a result of spillages. Mark was also exposed to petrochemicals and associated vapors through his skin when he cleaned out pumps and other equipment as part of his job responsibilities.

16. Hydrocarbons contain one or more benzene rings and are by-products of the coke-oven and petroleum industries. Common hydrocarbons include, without limitation, ethylene, propylene, and benzene, and most solvents (oxygenated or non-oxygenated) contain various levels of hydrocarbons. Acute dermal contact with liquid aromatic hydrocarbons can cause dermatitis and other skin-related afflictions. Aspiration of liquid aromatic hydrocarbons can also cause severe lung damage including, but not limited to, pulmonary edema, pneumonitis, and hemorrhage. The inhalation of vapors from aromatic hydrocarbons can cause drowsiness, fatigue, vertigo, nausea, and headaches; inhalation at extremely high concentrations can result in convulsions followed by paralysis, loss of consciousness, circulatory collapse, and death. Chronic, prolonged inhalation of

---

[6] The third defendant in the PI Action, Turner Industries Group, L.L.C., is alleged in the PI Action to have been a contractor at the Geismar Plant and appears to have no corporate relationship to Uniroyal. Accordingly, the Plan Injunction irrefutably does not apply to it and it is not named as a defendant herein.

vapors from aromatic hydrocarbons contaminated with even minute amounts of benzene has a destructive effect on the blood-forming tissue and can cause severe anemia; leukopenia; myelodysplastic syndrome; AML; multiple myeloma; acute lymphocytic leukemia; and chronic lymphotcytic leukemia. Further, exposure to hydrocarbon-based solvents can cause severe, negative impacts on reproduction.

17. As noted, a result of Mark's described exposures Plaintiff was born prematurely and with profound birth defects. Plaintiff suffers from at least the following specific conditions: (a) Dandy-Walker disease (a congenital condition where the cerebellum (a portion of the brain primarily responsible for muscle control, balance and movement but that also plays a role in other cognitive functions such as language processing and memory) does not develop normally and which can also include heart defects); (b) scoliosis (a sideways curvature of the spine); (c) tetralogy of fallot (a congenital heart defect characterized by four different heart problems: a hole between the ventricles, the aorta being on top of both ventricles instead of only the left ventricle, a narrowing of the pulmonary valve or adjacent areas, and thickening of the right ventricle); and (4) duodenal atresia (a congenital intestinal obstruction). Mason has undergone more than 30 surgeries to date and will require extensive medical care and treatment for the rest of his life.

**The Underlying Bankruptcy, Notices, and Plan Injunction**

18. In or about 2009, Chemtura and certain of its affiliated debtors sought refuge in Chapter 11.[7] Their cases were jointly administered in *In re Chemtura Corp., et al.*, Case No. 09-

---

[7] Chemtura, incorporated in Delaware in 1999, is the successor to Crompton & Knowles Corporation ("C&K"), which was incorporated in 1900 and engaged in the manufacture and sale of specialty chemicals beginning in 1954. In 1996, C&K acquired Uniroyal Chemical Company, Inc. In 1999, C&K merged with Witco Corporation ("Witco") and became CK Witco Corporation. In 2000, CK Witco Corporation changed its name to Crompton Corporation. In 2005, Crompton Corporation acquired Great Lakes Chemical Corporation ("GLCC") and several of its affiliates and subsidiaries. Concurrently with the acquisition of GLCC, Crompton changed

11233 (REG) (the "**Bankruptcy Case**") in the Southern District of New York. According to the Disclosure Statement in the Bankruptcy Case, Chemtura had acquired Uniroyal in 1996.[8]

19.     The Bankruptcy Court presiding over the Bankruptcy Case issued a bar date order establishing October 30, 2009, as the claims Bar Date. A notice-by-publication regime was conceived and implemented in the Bankruptcy Case.[9] Notices of the Bar Date were published in more than 100 newspapers in the lower 48 states. Additionally, numerous "site-specific" notices were published concurrently with notices of the Bar Date. Some notices—but notably *not* the site-specific notice addressed to residents of Geismar—were published in newspapers proximate to the particular site and thus made easily accessible to their intended audience. One such targeted notice, for example, concerned Plainsboro, Middlesex County, New Jersey, since a customer had purchased a harmful chemical, diacetyl, from Chemtura, *et al*., for its plant located there. That site specific notice was published in a Middlesex County newspaper, and the district court in *Gabauer v. Chemtura Corp. (In re Chemtura Corp.)* [*Chemtura II*], 505 B.R. 427 (S.D.N.Y. 2014) lauded this carefully targeted notice as "[m]ost important" and found it "'reasonably calculated, under all the circumstances, to apprise the [diacetyl claimants] of the pendency of the action and afford them an opportunity to present their objections.'" *Id*. at 431 (quoting *Mullane v. Central Hanover Bank*

---

   its name to Chemtura, which was a Debtor in the Chapter 11 Cases and the direct or indirect parent of each of the other 26 Subsidiary Debtors. *See Notice of Filing of Revised Disclosure Statement for the Joint Chapter 11 Plan of Chemtura Corporation, et al. (Solicitation Version),* § IV(a) [Bankruptcy Case Docket No. 3503] ("**Disclosure Statement**").

[8]  In a letter dated January 26, 2024, addressed to Plaintiff's personal injury counsel, counsel for LANXESS asserts that on April 21, 2017, in conjunction with the acquisition of Chemtura by LANXESS Deutschland GmbH, a German corporation, LANXESS Solutions US Inc. (DE) merged with and into Chemtura, with Chemtura as the surviving entity. Simultaneously with the merger, Chemtura changed its name to LANXESS Solutions US Inc. (DE). Then, on October 1, 2020, LANXESS Solutions US Inc. (DE) merged with and into its parent, LANXESS Corporation.

[9]  *See* Affidavit of Publication of Notice of Bar Date & Site Specific Notices from the Bankruptcy Case [Bankruptcy Case Docket No. 1205].

*& Trust Co.,* 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950)). The district court affirmed the bankruptcy court's order enforcing the discharge injunction against those diacetyl claimants. *Id*.

20.     In stark contrast, the site-specific notice to the community of Geismar was published in the remote New Orleans newspaper and not in the Baton Rouge paper, whose circulation would have arguably reached Geismar employees. This can hardly be said to have been "reasonably calculated under all the circumstances to apprise" potential claimants in and around Geismar of "the pendency of the action and afford them an opportunity" to take appropriate action and be heard.

21.     On November 3, 2010, the presiding bankruptcy court confirmed the Chemtura Plan. The order confirming the Chemtura Plan (the "**Confirmation Order**") includes following discharge provision:

> Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties….

Confirmation Order, § 141.

22.     The Confirmation Order also includes the following injunction:

> EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN PARAGRAPH 43 OF THIS ORDER [which deals with Chemtura, *et al.*'s releases of other entities and so not applicable here] THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.2, 11.3 OR 11.4, OR DISCHARGED PURSUANT TO SECTION 11.7 OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.6, ARE

> PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR RESPECT TO ANY SUCH CLAIMS OR INTERESTS, …

Plan Injunction (ALLCAPS in original), Confirmation Order, § 144.

**As a Known Creditor of Chemtura, Mason was Entitled to Actual Notice of the Bar Date.**

23. Mason was a known creditor of Chemtura, *et al.*, at the time of the bankruptcy. As alleged in the PI Action, that exposure to solvents could cause severe, negative impact on reproduction was known to Chemtura, *et al.*, at the time of the bankruptcy, and it was conceivable and foreseeable to Defendants that Mason's father would conceive a child during the course of his employment at Uniroyal and while working at the Geismar Plant. The potential for adverse reproductive outcomes to workers such as Mark as a result of the exposures to hydrocarbons, petrochemicals, and/or solvents was foreseeable to Chemtura, *et al.*, and should have been anticipated by same. Thus, Mason was a known creditor of Chemtura:

> Known creditors are defined as creditors that a debtor knew of, or should have known of, when serving notice of the bar date. … **A known claim arises from facts that would alert the reasonable debtor to the possibility that a claim might reasonably be filed against it**.

*In re Motors Liquidation Co.,* 585 B.R. 708, 725 (Bankr. S.D.N.Y. 2018) (emphasis added). Debtors are obliged to use reasonable diligence in "ferreting out" known creditors and what that entails depends on the particular facts of each case. A debtor's cursory review of its files to ascertain known creditors is insufficient. *In re Drexel Burnham Lambert Group, Inc.*, 151 B.R. 674, 680-81 (Bankr. S.D.N.Y. 1993) (citations omitted). In Mason's case, given the knowledge that Chemtura, *et al.*, had during the bankruptcy of the effects of exposure to its chemicals on reproductive systems, Chemtura, *et al.*, were alerted to "the possibility that a claim might reasonably be filed against it" by the affected children of its workers, and thus Mason was a known

creditor of Chemtura.

24. As a known creditor of Chemtura, due process required that Mason receive actual notice of the Bar Date. No actual notice of the Bar Date was directed to Mason or his parents, as they will attest. Further, the Bankruptcy Case docket indicates that neither Mark nor Tamara Swain, Mason's parents, nor young Mason himself, was given actual notice of the Bar Date, as none of them are listed in the 1000-page court-filed lists and supplements of entities and persons served with the Bar Date notice.[10] Because such constitutionally required notice was not given, Mason's PI Action is not barred by the Plan Injunction.

**Even if, *arguendo*, Mason were an Unknown Creditor, Chemtura, *et al.*'s Bar Date Publication Notice was Constitutionally Inadequate.**

25. Alternatively, due process requirements necessary to bind Mason to the Plan Injunction under Chemtura, *et al.*'s notice-by-publication regime if he were an unknown creditor were not satisfied. Although notice-by-publication was implemented in the Bankruptcy Case, the publication notice was insufficient to notify any of the Swains (Mason, Mark, or Mason's mother) of the Bar Date. Five newspapers published in Louisiana were included in the notice regime: the Caldwell *Watchman*, the Lake Charles *American Press*, the Monroe *News Star*, the New Orleans *Times Picayune*, and the Shreveport Times. However, the publication locales of all these Louisiana newspapers (and presumably also their circulation areas) are remote and distant from Geismar, where the Swain family lived. New Orleans is 67 miles away from Geismar. The others are all at least 150 miles away: Caldwell Parish (193 miles), Lake Charles (151 miles), Monroe (213 miles), and Shreveport (273 miles). "[I]f a creditor is not given reasonable notice of the bankruptcy

---

[10] *See* Affidavit of Service of Notice of Bar Date for Filing Proofs of Claim on October 30, 2009 [Bankruptcy Case Docket No. 1049, supplemented by Docket Nos. 1072, 1073, 1092, 1063, 1302, 1473].

proceeding and the relevant bar dates, its claim cannot be constitutionally discharged." *In re AMR Corp.*, 492 B.R. at 663 (quoting *Grant v. U.S. Home Corp. (In re U.S. Home Corp.)*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998).

26. As noted above, it is unreasonable that Chemtura, *et al.*'s notice-by-publication regime did not include a Baton Rouge newspaper. Not only is Geismar just 21 miles from Baton Rouge, it is part of the Baton Rouge metropolitan statistical area. Baton Rouge is the state capital, the second most populous city in Louisiana (after New Orleans), the only sizeable city in the south-central part of the state, and its metro area encompassed over 750,000 people in 2009. Baton Rouge has a respected and widely circulated daily newspaper, the *Advocate*. Finally, a number of small-town and smaller city newspapers were included in Chemtura, *et al.*'s notice-by-publication regime (such as the Middlesex County, New Jersey, paper referenced above), making the omission of the newspaper of a medium-size city proximate to the Geismar Plant unacceptable.

27. Also as noted, this unacceptability is accentuated by the decision to publish the site-specific notice to residents of Geismar in the New Orleans paper instead of the newspaper of nearby Baton Rouge that residents of Geismar were likely to actually see. A consolidated "special notice" for residents in five small Louisiana communities was published in the New Orleans Times-Picayune. While three of these communities (Harvey, Taft, and Harahan) are close to New Orleans, the other two (Geismar and Gonzalez) are much closer to Baton Rouge and decidedly within its orbit.

28. There is also the matter of what the Geismar "special notice" published in the New Orleans paper actually stated:

> [i]f you, or your property, or your spouse or immediate family member, was exposed to any of the [defined] Materials [which, as to the Geismar plant, lists various rubber-

related chemicals], and if that exposure directly or indirectly caused injury that becomes apparent either now or in the future, you may have a claim ….[11]

29. Even if Mason's father Mark had seen this notice published in the distant New Orleans paper—he did not nor was he reasonably likely to given the site of its publication—Mark might at most have apprehended that he himself was at risk because it was Mark, not Mason, who was directly exposed to the Materials. But to suggest that Mark was in any reasonable position to have connected the biological dots—the link between his exposure and unapprehended insult to his reproductive mechanisms that in turn caused Mason's injury at conception—is totally unrealistic and, if pressed by Defendants, inequitably opportunistic.

30. LANXESS, in its January 2024 letter to Plaintiff's personal injury counsel, has indicated it will primarily rely on *In re Chemtura Corp.* (*Chemtura III*), Case No. 09-11233 (JLG), 2016 WL 11651714 (Bankr. S.D.N.Y. Nov. 23, 2016). In *Chemtura III*, benzene claimants had sought damages in state court for personal injuries that they contended arose from exposure to benzene and a dozen other organic solvent-containing products, including mineral spirits allegedly manufactured or sold by Chemtura's predecessor in interest, Witco Corporation, and used by, Safety-Kleen Systems, Inc., in the manufacture and sale of "parts-washing machines and parts-washing solvents." *Id*. at *1. The benzene claimants alleged that they did not discover or diagnose the injuries until after the Chemtura Plan was confirmed. *Id*. at *10. The reorganized debtor contended that the Plan Injunction barred the prosecution of those lawsuits because the actions were on account of prepetition claims against the debtors that were discharged under the Chemtura Plan. The benzene claimants argued that enforcing the Plan Injunction would violate the benzene claimants' due process rights because they were not provided with adequate notice of the claims

---

[11] The "Materials" are defined in the special notice to include "EDMP rubber and other agricultural chemicals."

13

Bar Date. The Court found that the benzene claimants were afforded due process and received adequate notice of the Bar Date by publication and, as such, were discharged in the Chemtura Plan and permanently enjoined from proceeding against Chemtura. *Id*. at 2.

31. *Chemtura III* is distinguishable from Mason's case. First, Mason was a known creditor of the debtors entitled to actual notice, which he did not receive. Second, publication notice, if applicable here, was inadequate, as outlined above. Further, the benzene claimants in *Chemtura III* were suing for injuries to themselves caused by their own direct exposure to benzene. In sharp contrast, Mason is suing for congenital injuries he suffered as a result of his father's exposure and the impact of his father's exposure on his father's reproductive system. Mark is not the plaintiff in the PI Action; Mason is. Therefore, Mason's claim is not barred by the Plan Injunction.

**CAUSE OF ACTION**
**(Declaratory Judgment)**

32. Plaintiff repeats, realleges and incorporates herein by reference each and every allegation contained above as though the same were set forth herein.

33. Pursuant to 28 U.S.C. § 2201, the Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

34. Plaintiff has brought the PI Action in Louisiana state court seeking redress from injuries sustained prior to his birth as a result of his father's exposure to toxic chemicals.

35. The Confirmation Order's Plan Injunction enjoins prosecution of certain claims as provided therein.

36. Prosecution of the claims asserted in the PI Action, however, are not enjoined by

the Plan Injunction inasmuch as the notice regime with respect to the Bar Date did not, as to Plaintiff, satisfy the constitutional requirements of due process.

37. Further, it is both unreasonable as a factual matter and contrary to justice to maintain that a congenitally injured eleven year old child, injured at conception, and his parents could possibly have apprehended, prior to the Bar Date, that Mason has a claim against Chemtura, *et al.*, as a result of changes to his father's reproductive system caused by his father's own exposure to hazardous chemicals at the Geismar Plant prior to and during the period of Plaintiff's gestation.

38. There is a present controversy between Plaintiff and Defendants as to whether the prosecution of the PI Action is enjoined by the Plan Injunction in the Confirmation Order.

39. Plaintiff seeks a declaration that his prosecution of the PI Action is not enjoined by the Plan Injunction in the Confirmation Order.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mason Swain prays for judgment against Defendants LANXESS Corporation and Lion Copolymer Geismar LLC, as follows:

a) a declaration that the prosecution of the PI Action by or on behalf of Plaintiff is not enjoined by the Plan Injunction in the Confirmation Order in the Bankruptcy Case;

b) For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 11, 2024

        <u>/s/ *Peter D'Apice*</u>
Sander L. Esserman
Peter C. D'Apice
**STUTZMAN, BROMBERG, ESSERMAN & PLIFKA**
**A PROFESSIONAL CORPORATION**
2323 Bryan Street, Suite 2200
Dallas, Texas 75201-2689
(214) 969-4900
(214) 969-4999 (facsimile)
esserman@sbep-law.com
dapice@sbep-law.com